IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SYDNEY WILLIAMS,<br>　　　Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 22-cv-3090 |
| JAMIE L. BRAMBLETT, in her<br>individual capacity, GLENN CURRY,<br>in his individual capacity, ANGELA<br>KRAMP, in her individual capacity,<br>CAMELOT CARE CENTERS, LLC,<br>ERIN HELMHOLZ, and<br>KATHY HENKE,<br>　　　Defendants. | ) ) ) ) ) ) ) ) | |

## OPINION

**COLLEEN R. LAWLESS, United States District Judge:**

Before the Court is Defendants Glenn Curry's and Angela Kramp's Motion for Summary Judgment.[1] (Doc. 95). For the reasons that follow, Defendants' Motion for Summary Judgment is Granted.

## I.　INTRODUCTION

Plaintiff Sydney Williams, who is now an adult, was removed from her family on May 3, 2019, when she was 16 years old and continuously withheld from her family until September 15, 2020. (Doc. 59 at ¶¶ 12-13). The initial removal and continued removal were based on a "concern" raised by a consulting physician at St. Louis Children's Hospital ("SLCH") that Plaintiff's mother was fabricating Plaintiff's illness. (Doc. 101).

---

[1] Defendant Jamie Bramblett is also a party to this motion. In an Order entered on March 11, 2025, the claims against Defendant Bramblett were dismissed and struck. (Doc. 104).

Former Defendant Bramblett and Defendants Curry and Kramp were employed by the Illinois Department of Children and Family Services ("DCFS"). (*Id.* at ¶¶ 20-22). Bramblett was employed as a Child Protection Specialist while Curry and Kramp were employed as Public Service Administrators. (*Id.*)

Count I asserts claims against Defendants Curry and Kramp under 42 U.S.C. § 1983 for Fourteenth Amendment due process violations and continued withholding. (Doc. 59). The Court struck the claims asserted against Bramblett in Count I because Plaintiff did not obtain leave of Court to add Bramblett as a Defendant and, in fact, represented that she would "remove Bramblett and claims against Bramblett based on the Court's February 24, 2023 order." (Doc. 104). Counts II and III consist of state law claims for negligence and intentional infliction of emotional distress respectively against Defendants Camelot Care Centers, LLC, Erin Helmholz, and Kathy Henke. (Doc. 59). Counts IV, V, and VI were state law claims asserted against Bramblett, Curry, and Kramp that have since been dismissed without prejudice. (Doc. 104).

## II.    FACTUAL BACKGROUND

### A. Parties

Plaintiff resides with her parents, Geri and Scott Williams, in Chatham, Illinois. (Doc. 96 at ¶ 1). Bramblett has been employed as a child protection investigator in the DCFS office located in Springfield, Illinois, since approximately 2013. (*Id.* at ¶ 2). Curry was employed by DCFS as a child protection supervisor in the Springfield office from 2015 until approximately 2020 or 2021. (*Id.* at ¶ 5). At all relevant times, Kramp was

employed by DCFS as an area administrator during the investigation as to Plaintiff. (*Id.* at ¶ 6).

Plaintiff does not independently recall Bramblett, Curry, or Kramp as DCFS employees other than recognizing their names. She does not believe she ever spoke to Bramblett. (*Id.* at ¶ 7). Plaintiff testified she does not know whether any information exists that would lead her to believe Bramblett made misrepresentations about the investigation to the Juvenile Court.[2] (*Id.* at ¶ 8).

### B. DCFS Child Abuse Investigation

On May 2, 2019, Larissa Zguta, a hospital social worker at SLCH, made a report to the DCFS child abuse hotline, which was memorialized as follows:

> The reporter is calling with concerns for Sydney (16) while in the care of Gerri (mother) and Scott (father), and medical staff have expressed concern for Munchausen Syndrome by Proxy. It was reported that Sydney has been seen by 9 different hospitals in 5 different states in the past "couple" of years. Sydney is currently admitted to the St. Louis Children's Hospital due to Scott and Gerri alleging that Sydney is having gastrointestinal issues. Sydney previously had a feeding tube surgically inserted; however, it was removed after it was determined that Sydney no longer needed it. Gerri and Scott are not requesting that the feeding tube be reinserted. The parents are claiming that Sydney is unable to eat or swallow, but medical staff have observed Sydney eating and swallowing. The reporter states that Sydney has received multiple scopes, scans, and tests, and no cause of Sydney's alleged medical issues have been found. Gerri and Scott have brought Sydney's medications from home and are refusing for the hospital to administer medication from their pharmacy. Medical staff cannot determine what all medications that are being administered Sydney as the medications have been mixed and compounded. A psychologist met with Sydney and reported that Sydney is "socially immature" as she behaves much younger than 16. On 3/9/19 and 5/1/19, Sydney tested positive for THC, and medical staff is "skeptical" how Sydney obtained the substance.

---

[2]While Plaintiff purports to dispute this assertion, the materials she cites in support of her position do not pertain to whether Bramblett made misrepresentations about the investigation.

Sydney will be kept at St. Louis Children's Hospital for at least another 24 hours. Sydney has an IEP. . . .

(*Id.* at ¶ 9).

On May 3, 2019, Bramblett was assigned to investigate the report of child abuse and met with her supervisor to discuss the investigation. (*Id.* at ¶ 10). Bramblett interviewed Zguta and Dr. Adrienne Atzemis, a physician at SLCH. (*Id.* at ¶ 11). Dr. Atzemis is a board-certified child abuse pediatrician, chief of the child abuse pediatrics section at Washington University School of Medicine, and the medical director of the child protection program at SLCH. (*Id.* at ¶ 12). The child protection program at SLCH is a multidisciplinary group of professionals that includes physicians trained in child abuse pediatrics, social workers, nurse practitioners, medical assistants, and support staff. The program involves caring for children when there is suspicion that child maltreatment may have occurred. The program is a consultative service which relies on consultation requests from other providers in the hospital system. It includes inpatient consultations, outpatient clinics, case reviews on patients that have been seen in person, and requires continuous education. (*Id.* at ¶ 13). Dr. Atzemis has experience with child victims of caregiver-fabricated illness through her medical school education and her subspecialty training during her fellowship in which her program evaluated and cared for children who may have been victims of the condition. Dr. Atzemis's education includes didactic instruction, one-on-one teaching with mentors and program directors, independent learning, and continuous medical education to stay updated on significant publications. (*Id.* at ¶ 14).

On or about May 1, 2019, the pediatric hospitalist team at SLCH requested Dr. Atzemis for a consultation on Plaintiff at which time two concerns were expressed to Dr. Atzemis: 1) the unanticipated positive result of THC on the drug screen, and 2) possible factitious or induced symptoms. (*Id.* at ¶ 15). On May 3, 2019, Dr. Atzemis reported to Bramblett that Plaintiff was admitted to SLCH for dizziness, nausea, and vomiting and a drug screen of Plaintiff resulted in a positive for THC twice. Dr. Atzemis stated THC can cause the symptoms Plaintiff reported, such as dizziness, nausea, and vomiting. (*Id.* at ¶ 16). The investigative notes provide Dr. Atzemis further noted that, while the parents were not honest about the use of CBD oil, they admitted to giving CBD to Plaintiff after being confronted with the positive THC results. The parents disagreed as to when the last dose of THC was given. (*Id.* at ¶ 17). Dr. Atzemis stated Plaintiff was on a significant number of medications which were prescribed outside of the hospital and the parents insisted on using the medications from home. However, the hospital stopped all outside medications, food, and drinks because the hospital could not determine the origin of the THC. A staff member was always present with the parents and Plaintiff to ensure the parents did not administer anything that was unapproved. (*Id.* at ¶ 18). The parents wanted Plaintiff discharged from the hospital immediately. (*Id.* at ¶ 19).

Dr. Atzemis reported Plaintiff's symptoms stopped and there had been no vomiting or diarrhea. Although the parents reported to staff that Plaintiff could not swallow anything, she was observed eating Jell-O. (*Id.* at ¶ 20). Furthermore, the parents reported to the hospital that Plaintiff was diagnosed with Eosinophilic Esophagitis (EOE). After the hospital reviewed medical records, Dr. Atzemis opined there is a "long-

standing pattern of escalation of symptoms that cannot be confirmed upon testing." (*Id.* at ¶ 21). Dr. Atzemis further noted numerous medical records involved only phone calls and that Plaintiff had physicians in multiple locations-- including Chatham, Springfield, and Normal, Illinois, as well as in St. Louis, Cleveland, Wisconsin and Arizona. Additionally, several specialists were treating Plaintiff but it appeared they did not know about one another. (*Id.* at ¶ 22). Dr. Atzemis spoke to some of the specialists to confirm their knowledge of each other. (*Id.* at ¶ 23).

Dr Atzemis reported the parents were using a pharmacy in Peoria that had been cited by the FDA for several instances where medications were not compounded correctly or had been contaminated. (*Id.* at ¶ 24). Dr. Atzemis further reported the parents requested Plaintiff have a feeding tube inserted because, according to them, Plaintiff could not eat. (*Id.* at ¶ 25). Dr. Atzemis was in the hospital room with the parents and Plaintiff when the mother said Plaintiff could not swallow and food was getting stuck in Plaintiff's throat. When Dr. Atzemis stated she was calling DCFS, the mother immediately said Plaintiff was fine. (*Id.* at ¶ 26). Dr. Atzemis opined the procedure "would have been completely medically unnecessary" because there was "no medical reasoning, diagnosis, symptoms, or testing that would have supported the need for the g-tube." (*Id.* at ¶ 27). Dr. Atzemis requested to keep Plaintiff at the hospital for observation in order to take her off her medications to determine her medical issues and develop an appropriate medical plan. (*Id.* at ¶ 28).

Bramblett reviewed the reports and notes from a parallel child protective services investigation in Missouri. (*Id.* at ¶ 29). On May 3, 2019, an agreed safety plan was

implemented wherein the parents agreed to follow treatment recommendations from SLCH and to refrain from the following: 1) being alone with Plaintiff; 2) providing medication or food to Plaintiff; or 3) removing Plaintiff from the hospital. (*Id.* at ¶ 30). Kramp approved the safety plan. (*Id.* at ¶ 31).

Bramblett interviewed the parents and communicated with them throughout the investigative process. (*Id.* at ¶ 32). She documented the list of medical providers provided by Scott Williams and informed Mr. Williams that she needed to request medical records directly from the hospitals because she believed the list was missing several providers. (*Id.* at ¶ 33). Bramblett testified she declined to accept a disk from Scott Williams containing Plaintiff's medical records because she did not know if it contained all of Plaintiff's records. (Doc. 91-2 at 30-32). Bramblett also reviewed school records. (Doc. 96 at ¶ 34).

On May 7, 2019, Dr. Atzemis and Larissa Zguta informed Bramblett that the hospital had not yet observed any objective evidence of Plaintiff's reported symptoms at the time of admission. (*Id.* at ¶ 36). The toxicology lab at SLCH indicated Plaintiff's positive result for THC could be from the CBD oil that the parents provided to Plaintiff on their own and without medical supervision. (*Id.* at ¶ 37). Dr. Atzemis reported Plaintiff was taken off her heart medications and was tested for Postural Orthostatic Tachycardia Syndrome ("POTS") ten times. All tests came back as normal, with only one being close to abnormal. Plaintiff's medical history did not support POTS. (*Id.* at ¶ 38).

Dr. Atzemis further reported the parents were not compliant with follow up treatment. The parents had a pattern of seeking treatment, reporting symptoms, and then

within a day of Plaintiff's prescribed medication not working, they would call the doctor, go to the emergency room, or contact another physician. (*Id.* at ¶ 39). In response, Plaintiff notes Dr. Atzemis acknowledged she was not qualified to form opinions in the specialties related to Plaintiff's complex medical condition and could not give a diagnosis related to mitochondrial disorder, cyclic vomiting syndrome, or POTS. (Doc. 101).

Bramblett's contact note further provides Dr. Atzemis reported directly speaking with Dr. Zaidi, Plaintiff's cardiologist, and discovering that her parents called him every day including weekends and holidays. Dr. Zaidi stated there was no objective evidence to support any diagnosis and that all of his information was based on the parents' report and history. Dr. Zaidi placed Plaintiff on a 30-day heart monitor and the results appeared to be normal. (Doc. 96 at ¶ 40). The parents reported cyclic and bloody vomiting, but it was not documented in medical records as observed by any medical providers. (*Id.* at ¶ 41). In reviewing Plaintiff's medical records, Dr. Atzemis determined Dr. Natowicz was the original doctor who allegedly diagnosed Plaintiff with mitochondrial disorder based on a presumption that she had it due to the reported symptoms. Subsequent evaluations for mitochondrial disorder in 2006, 2007, and 2011 did not support a diagnosis. (*Id.* at ¶ 42). As of May 7, 2019, SLCH continued Plaintiff's admission and safety plan to determine and evaluate her symptoms. (*Id.* at ¶ 43).

On May 10, 2019, Scott Williams emailed Bramblett to inform her that Plaintiff's health deteriorated after SLCH removed "mitochondrial support." Scott stated both parents "agree that Sydney's symptoms have not been diagnosed [for mitochondrial disorder] yet" and "agreed . . . that the best place for Sydney is in the hospital so further

evaluation can take place." (*Id.* at ¶ 44). Bramblett met with Scott that day to renew the safety plan and he signed the safety plan on May 11, 2019. (*Id.* at ¶ 45).

Bramblett's contact note for May 14, 2019 indicates she participated in a staffing for Plaintiff with numerous SLCH medical professionals including Dr. Atzemis, Hospitalist Dr. Sarah Smith, Social Worker Larissa Zguta, the clinical genetics attending and fellows, and individuals from the neurology department. (*Id.* at ¶ 46). The medical team reported Plaintiff had more anxiety, episodes, and symptoms when she is with her mother. (*Id.* at ¶ 47). The medical team further reported Plaintiff had a panic attack when she saw a piece of cheese on her dinner plate and the mother requested allergy medication, even though Plaintiff did not ingest the cheese. (*Id.* at ¶ 48). The medical team conducted mitochondrial testing which determined Plaintiff did not meet two of the three elements for mitochondrial disorder. The third element to a diagnosis is genetic and a genetic study for the entire family was completed. While two genetic abnormalities were found, the medical team opined that a mitochondrial disorder diagnosis is unlikely because the other two elements were not met, including the "gold standard" for the diagnosis, which is elevated lactic acid levels. Plaintiff's lactic acid levels have never been elevated. (*Id.* at ¶ 49). The medical team also noted that the parents reported Plaintiff was diagnosed with specific mitochondrial complexes. The medical team was unaware of any documentation or evidence to support the specific diagnosis. (*Id.* at ¶ 50).

The medical team stated that the hospital was in the process of reviewing all of Plaintiff's available medical records with a particular focus on the last two years. (*Id.* at ¶ 51.) It was reported Plaintiff had 120 separate medical encounters in 2019 including 14

clinical visits with 10 different providers and numerous hospitalizations. (*Id.* at ¶ 52). The medical team stated there was a pattern of pathologic, dysfunctional medical treatment being sought by the parents and a disconnect between the symptoms reported by the parents and the symptoms observed by staff. The parents typically called a provider to report Plaintiff was dehydrated, in pain, and unable to eat or keep anything down. The provider would then advise Plaintiff needed to be seen for medical care and emergency room staff would determine Plaintiff was healthy. It was further reported that Plaintiff had undergone multiple invasive procedures based on history provided by the mother including the following: 1) upper GI biopsies; 2) feeding tube; and 3) a "g-button" because Plaintiff had allegedly gone 10 days without food and water and had lost 11 pounds. Records showed there were no signs of dehydration and there was a weight loss of only 1.1 pounds. (*Id.* at ¶ 54).

The contact note references a note in June of 2018 by Plaintiff's geneticist, Richard Frye, M.D., Ph.D., wherein he described Plaintiff as doing well and without problems. However, there was a sharp increase in the frequency of the parents seeking medical treatment in August and September of 2018, which increased even more in October and November of 2018. (*Id.* at ¶ 55). The medical staff reported Dr. Siri's notes showed a pattern of seeking medical treatment by multiple different providers. (*Id.* at ¶ 56). The medical staff further noted concern for a pattern of dishonesty by the parents due to inaccurate reports to medical providers and a concern for the environment at home. (*Id.* at ¶ 57).

According to a supervisory note, on May 14, 2019, Bramblett consulted with her supervisor, Glenn Curry, about the conference call with the medical team from SLCH. (*Id.* at ¶ 58). On May 14, 2019, Bramblett received a signed and sworn Medical Affidavit from Dr. Atzemis stating that she has reasonable cause to suspect Plaintiff's mother provided false information, withheld information, exaggerated Plaintiff's symptoms, and coached Plaintiff. (*Id.* at ¶ 59). Dr. Atzemis further stated that based on her review and tabulation of the majority of the available medical records — with a focus on the past year and discussions with Plaintiff's health care providers — she has "reasonable cause to suspect that Sydney has received unnecessary harmful or potentially harmful medical care due to Caregiver Fabricated Illness and requires protection from this pattern of pathological healthcare seeking behavior." (*Id.* at ¶ 60). Dr. Atzemis testified to the dangers of inaccurately reporting symptoms and the potential risk of harm to Plaintiff. (*Id.* at ¶ 61).

Dr. Atzemis testified she reviewed approximately 90% of the thousands of pages of medical records she accessed through the in-network hospital system, an out-of-network hospital system, and received from various other medical providers that she personally reached out to. (*Id.* at ¶ 62). While she focused on the past year of medical records for the purpose of the Medical Affidavit, the medical records she reviewed included Plaintiff's medical history since 2005, as reflected in the excel spreadsheet in which she tabulated Plaintiff's medical history. (*Id.* at ¶ 63). Dr. Atzemis believed it was appropriate to focus primarily on the past year because she was confident that she had the majority of the records for that year and that timeframe is the most relevant to

evaluate a concern of healthcare-seeking behavior. (*Id.* at ¶ 64). Dr. Atzemis testified her "concern for caregiver-fabricated illness was based on the healthcare-seeking behavior, and the presence or absence of any [] differential diagnoses would not necessarily dispute the harm that was occurring to Sydney," and that "waiting for a specific diagnosis did not change her concern for harm related to caregiver-fabricated illness." (*Id.* at ¶ 65).

### C. Juvenile Court Proceedings During DCFS Investigation

On May 16, 2019, Assistant State's Attorney Edward Brandt filed a petition for shelter care in the Circuit Court of the Seventh Judicial Circuit, Sangamon County, Illinois, *In re S.W.*, 19-JA-92 ("Juvenile case"). (*Id.* at ¶ 66). On May 6, 2019, the Juvenile Court of Sangamon County conducted a hearing and ordered Plaintiff into DCFS custody. DCFS was given the right to consent to medical treatment with the parents' agreement and the parents identified Plaintiff's aunt, Brittany Gamber, as a relative placement option. Defendant Bramblett was present at the hearing. (*Id.* at ¶ 67). That day, Bramblett met with Curry, and informed him of the Juvenile Court decision to place Plaintiff in the protective custody of DCFS. (*Id.* at ¶ 68). On May 16, 2019, Bramblett interviewed Gamber as a foster placement option. (*Id.* at ¶ 69).

On May 20, 2019, Bramblett met with Plaintiff, who reported "she is doing okay" at her foster home and that she is "eating well" and "can swallow her pills just fine." Plaintiff "appeared to be excited about school" and showed Bramblett her homework. (*Id.* at ¶ 70). According to the contact notes, Bramblett met with Brittany and Ryan Gamber in the foster home, and they reported Plaintiff has difficulty using public restrooms. "They have not had any issues with her ability to eat," although Plaintiff

believes she cannot have certain foods even though she has never been allergic to those foods. The Gambers advised Bramblett that Plaintiff's medical appointments are set, and they are "comfortable" with the medical plan. (*Id.* at ¶ 71).

On May 22, 2019, Attorney Greg Sronce, counsel for Plaintiff's parents, sent a letter from Dr. Frye dated May 21, 2019, to Bramblett and Assistant State's Attorney Brandt. (*Id.* at ¶ 72). Bramblett forwarded Dr. Frye's letter to her supervisors Curry and Kramp. (*Id.* at ¶ 73). Bramblett also forwarded Dr. Frye's letter to Dr. Atzemis, who opined that the letter did not change her medical opinion or alleviate her concerns for Plaintiff. (*Id.* at ¶ 74).

On May 28, 2019, Defendants Bramblett and Curry met Defendant Erin Helmholz, a caseworker at Defendant Camelot Care Centers, for a "handoff staffing" where the case was transferred from DCFS to Camelot Care Centers. Bramblett provided an explanation of the investigation to date including concerns noted by the medical staff at SLCH and recommended services. A transitional visit was scheduled with Bramblett and Helmholz. (*Id.* at ¶ 75). Plaintiff objects to the foregoing allegation to the extent it suggests DCFS did not have any responsibility for Plaintiff after May 28, 2019. (Doc. 101 at 3 n.2). DCFS Department Procedure 315.130(a)(2) describes "handoff staffing" as follows:

> Handoff Staffing. Within 5 days after case assignment, the Permanency Worker and Supervisor shall meet with the Child Protection Specialist and Supervisor to transfer the child and family's case for provision of services. Although the Child Protection Specialist remains responsible for ensuring the child's safety during the entire investigation process, once the case has been fully transferred to a Permanency Worker, the safety assignment will be a collaborative assessment between the Child Protection Specialist and the assigned Permanency Worker until the completion of the child abuse/neglect report.

(Doc. 96 at ¶ 76). Defendant Kramp testified that, after a case transitions to a permanency team, the DCFS child protection team generally does not remain involved with the family. (*Id.* at ¶ 77). Plaintiffs dispute this allegation on the basis Plaintiff remained in the custody of DCFS and the State's duty continues through the period of foster care. (Doc. 101 at 4).

On May 29, 2019, Greg Sronce sent a letter from Dr. Schmidt to Bramblett, Brandt, and Guardian ad Litem Kate Hall. On May 30, 2019, Sronce sent medical records from Dr. Zaidi to the same. Brandt notified Sronce that the State planned to proceed with the case. (Doc. 96 at ¶ 78). On May 31, 2019, Bramblett asked for opinions from Plaintiff's other doctors. Dr. Zaidi reported seeing Plaintiff only once at the clinic and all other interactions were via phone calls. Dr. Zaidi opined that whatever information he had was based on reports from Plaintiff's parents and not from clinical exams. He stated that he would defer to St. Louis on their findings or evaluations because they were able to observe Plaintiff in person and for a longer period. (*Id.* at ¶ 79). On May 31, 2019, Bramblett and caseworker Erin Helmholz completed a transitional visit with the foster parents and Plaintiff. (*Id.* at ¶ 80).

On June 7, 2019, Bramblett, Scott Williams, and Helmholz testified at the shelter care hearing in the Juvenile case. (*Id.* at ¶ 82). The Medical Affidavit from Dr. Atzemis, attending physician for the Child Protection Unit at SLCH, was admitted into evidence on behalf of the State. (*Id.* at ¶ 83). The following documents were admitted into evidence on behalf of the Respondent Parents: a 2005 visit note from Dr. Natowicz; a May 16, 2019 letter from Dr. Khaled; a May 21, 2019 letter from Dr. Frye; a letter from Dr. Siri; and a

April 2, 2019 visit note from Advocate Medical Group in Normal, Illinois. (*Id.* at ¶ 84).

Bramblett testified that the SLCH medical team provided a medical affidavit that

Plaintiff's care at home was inappropriate and placed her safety at risk. (*Id.* at ¶ 85).

Bramblett further testified that the medical team reviewed "medical records for the past

two years" and did not find "diagnostic information" to support the diagnoses reported

by Plaintiff's parents, and that the parents exaggerated and potentially fabricated

symptoms placing Plaintiff at risk of receiving unnecessary medical treatments and

procedures. (*Id.* at ¶ 86). Dr. Atzemis reviewed the medical records that were available

on a shared medical system with doctors and specialists throughout the State and she

spoke to most of Plaintiff's treating physicians. (*Id.* at ¶ 87).

Bramblett testified that two years of medical records were reviewed because the

records were substantial and Plaintiff had been hospitalized in nine different hospitals in

five different states over that period of time. (*Id.* at ¶ 89). At the time Plaintiff was

admitted to the SLCH, the parents reported her symptoms as nausea, vomiting, dizziness,

and diarrhea. The medical team at SLCH reported that they observed vomiting once after

she had a panic attack. Plaintiff reported dizziness throughout her stay. Plaintiff's parents

reported that the dizziness was so severe that Plaintiff required a wheelchair. However,

Plaintiff was ambulatory during the hospitalization. (*Id.* at ¶ 90). Bramblett testified that,

based on information from the medical staff at SLCH, the reported symptoms could be

side effects of the THC that was in the CBD oil administered to Plaintiff by her parents.

Furthermore, she testified that dizziness and nausea could be symptoms of Plaintiff's

diagnosed anxiety. (*Id.* at ¶ 91). Bramblett testified Plaintiff had not presented with any

symptoms that would require hospitalization since her discharge and that she has been doing well overall. The foster parents report Plaintiff will say she is dizzy after speaking with parents but otherwise reports that she is doing fine. (*Id.* at ¶ 92). Bramblett testified that DCFS deferred to the doctors at SLCH who were treating Plaintiff at the time. (*Id.* at ¶ 93).

The Juvenile Court considered the testimony and evidence presented and found that there was probable cause to believe Plaintiff was neglected, noting Dr. Atzemis's affidavit. (*Id.* at ¶ 94). The Juvenile Court granted temporary custody to DCFS with the right to consent to medical treatment and ordered that the parents may not participate or attend medical appointments. Additionally, the Juvenile Court ordered the parents to cooperate with a psychological evaluation. (*Id.* at ¶ 95).

### D. Conclusion of DCFS Investigation

On July 1, 2019, a final supervision consultation was held. Bramblett met with Curry and recommended that both parents be indicated for Allegation of Harm # 10 – Substantial Risk of Physical Injury. Curry agreed with the recommended indicated finding on the following basis:

> CPI documented an extensive history of the parents seeking, even demanding, medical treatments and procedures for which there was no objective medical reason. While some of the child's physicians submitted letters of support for the parents, the Child Protection Team at St. Louis Children's Hospital has provided a medical affidavit which states that it is unsafe for Plaintiff to be placed with her parents due to their behaviors. The Child Protection team at St. Louis Children's Hospital's affidavit also states that Sydney is a victim of Childhood Fabricated Illness (also known as Fictitious disorder by proxy). The parents have sought out multiple medical providers in search of said treatments and procedures, and many of the providers had not been made aware of each other. There were instances of

duplicate specialty physicians for the same medical condition. Many of these medically unnecessary procedures caused the child pain and discomfort. The parents' behavior also placed the child at serious risk of harm. The child was ordered into DCFS custody and was placed into relative foster care. Public Service Administrator (PSA) conducted final supervision with Child Protection Investigator (CPI) regarding this case. PSA agreed with CPI recommended finding.

(*Id.* at ¶ 96). The child protection investigation involving Plaintiff concluded upon approval of the recommended indicated finding on July 1, 2019. (*Id.* at ¶ 98).

### E. Continuation of Juvenile Court Proceedings

The Juvenile Court proceedings continued. On December 13, 2019, Respondents filed a forensic psychological evaluation completed by Dr. Hamon, Psy.D., who was chosen by the parents to perform the court-ordered psychological evaluation. Dr. Hamon diagnosed Mrs. Williams with Adjustment Disorder with Mixed Disturbance of Emotion (anxiety) and Conduct, Multiple Continuous Stressors. (*Id.* at ¶ 99). On July 24, 2020, the Juvenile Court held a dispositional hearing and found it was in the best interest of the minor and the public that the minor be made a ward of the Juvenile Court, that the minor's parents were unfit to care for the minor, and that all reasonable efforts had been made to keep the minor in the home as set forth by the Court. (*Id.* at ¶ 101).

Upon request of Guardian ad Litem Frioli, the Juvenile Court set a goal of independence for Plaintiff and set a permanency review hearing date for December 18, 2020. (*Id.* at ¶ 102). The Juvenile Court noted the parents' right to appeal. (*Id.* at ¶ 103). Brittany Gamber testified at the Juvenile Court dispositional hearing for the State and Pamela Burkhart and Ceri Williams testified on behalf of the parents. (*Id.* at ¶ 104). The following documents were admitted on behalf of the parents: Dr. Hamon's Forensic

Psychological Report; Dr. Bole's Expert Report dated July 13, 2020, over the State's objection; Letter from Pamela Burkhart, LCSW, to Erin Helmholz dated May 12, 2020; Treatment Plan for Scott Williams from April 2020; Treatment Plan for Geri Williams from April 2020; photos of Plaintiff; the Dispositional Report filed on July 17, 2020, was admitted on behalf of the State. (*Id.* at ¶ 105). The court ordered that the protective order remain in effect and in place until terminated or modified for a period of six months from the date of the dispositional order. (*Id.* at ¶ 106).

Plaintiff alleges she was continuously withheld from her family for 16 months until September 5, 2020. (Doc. 59 at ¶¶ 12-13). After turning 18, Plaintiff returned home on her own accord. (*Id.* at ¶ 14).

## III.    DISCUSSION

Defendants Curry and Kramp proffer several reasons as to why they are entitled to summary judgment: (1) they did not violate Plaintiff's constitutional rights; (2) they cannot be held liable for their supervisory role under the *respondeat superior* doctrine; (3) they are entitled to qualified immunity; (4) the action is barred by the *res judicata* and *Rooker-Feldman* doctrines; and (5) state sovereign immunity applies to the state law negligence claims against DCFS employees and may only be pursued in the Illinois Court of Claims.

In response, Plaintiff claims summary judgment is not warranted for the following reasons: (1) Defendants violated Plaintiff's fundamental rights and Defendants are not immunized for their misconduct; (2) Plaintiff's claims against Curry and Kramp arise from their individual acts as supervisors of Bramblett and are not based on *respondeat*

*superior* liability; (3) the doctrines of *res judicata* and *Rooker-Feldman* are inapplicable to Plaintiff's due process claims; and (4) sovereign immunity does not apply to Defendants.

## A. Legal Standard

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those that might affect the outcome of the suit, and a factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Biggs v. Chic. Bd. of Educ.*, 82 F.4th 554, 559 (7th Cir. 2023) (internal quotation marks and citation omitted). The Court views the evidence and construes all reasonable inferences in favor of the non-movant. *Driveline Systems, LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019). To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture." *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted). "The court does not assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence." *Driveline Systems*, 936 F.3d at 579 (internal quotation marks omitted).

## B. Qualified Immunity

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. California*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

When a defendant invokes qualified immunity in seeking summary judgment, the plaintiff bears the burden of demonstrating that the defendant violated a constitutional right and that the constitutional right was clearly established, such that "a reasonable official would understand that what he is doing violates that right." *Mabes v. Thompson*, 136 F.4th 697, 705 (7th Cir. 2025) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The "clearly established" inquiry must be "particularized" to the facts of the case. *Id.* (citing *White v. Pauly*, 580 U.S. 73, 79 (2017)). The court must focus on each claim and "determine whether *each* defendant violated [Plaintiff's] rights and, if so, whether that right defined at an appropriate level of specificity, was clearly established at the time." *Id.* at 706 (emphasis in original).

Plaintiff alleges the fundamental right at issue is her right to familial relations, which includes a child's right to be raised and nurtured by her parents. *See Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1018 (7th Cir. 2000). Citing *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003), Plaintiff notes that while "child welfare caseworkers may investigate allegations of child abuse without violating parents' constitutional right to familial relations, they may not do so arbitrarily." *Id.* at 520. Before determining a child must be protected from her parents, the state must have "some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Brokaw*, 235 F.3d at 1019. Plaintiff further contends that only after equally considering all available inculpatory and exculpatory evidence "may the investigator decide whether that totality of evidence would cause a reasonable individual to believe that a child was abused or neglected." *Dupuy v. Samuels*, 397 F.3d 493, 505-06 (7th Cir. 2005). However,

Plaintiff's assertion is based on a DCFS rule, *see id.*, and the "failure to comply with state procedures does not demonstrate the violation of Plaintiff's clearly established constitutional due process rights." *Ault v. Speicher*, 634 F.3d 942, 947 (7th Cir. 2011).

Plaintiff suggests this case is like *Brokaw*, wherein the Seventh Circuit observed that "in the most extreme cases, an analogous case might never arise because the existence of the right was so clear, as a matter of the wording of a constitutional or statutory provision or decisions in other circuits or in the state courts, that no one thought it worthwhile to litigate the issue." *Brokaw*, 235 F.3d at 1022 (internal quotation marks and citation omitted). The Court has no trouble concluding this is not such an extreme case where a constitutional violation is obvious. Significantly, Dr. Atzemis, the medical director of the child protection program at SLCH, stated Dr. Frye's letter did not change her medical opinion or alleviate her concerns. Plaintiff fails to explain why Defendants should have ignored that opinion.

Plaintiff has failed to cite any factually analogous cases in support of her contention that Curry's and Kramp's alleged violation of DCFS procedures put them on notice that their conduct also violated Plaintiff's clearly established constitutional rights. Plaintiff points to *Dupuy* as being sufficient to put Defendants on notice that their actions violated Plaintiff's due process rights. However, *DuPuy* involved childcare workers who were indicated for child abuse or neglect and the extent of process to which they were entitled. *Dupuy*, 397 F.3d at 503-09. Plaintiff also cites *Kemp v. Liebel*, 877 F.3d 346 (7th Cir. 2017), wherein the court considered whether two Jewish prison inmates' First Amendment rights were violated when they were transferred to a facility that did not

offer opportunities for Jewish group worship and study. *Id.* at 348. Neither *Dupuy* nor *Kemp* involved the right to familial relations.

Plaintiff notes Defendant Curry, who was assigned to supervise the medical abuse investigation, testified that as a supervisor it is his responsibility to look at what the report of abuse contained including the narrative, the subjects, the allegation, and to set out an investigative plan for the investigator to follow, including what interviews are to be conducted and what evidence needs to be gathered. Thus, Plaintiff asserts Curry knew of and condoned "Bramblett's woeful dereliction of duties." (Doc. 101 at 22-23).

Plaintiff further contends that once Bramblett received Dr. Frye's May 22, 2019 letter providing the medical diagnosis of mitochondrial disorder that explained Plaintiff's conditions, there could no longer be any basis for suspicion of medical neglect. Bramblett forwarded Dr. Frye's letter to Curry and Kramp, which Plaintiff alleges establishes Defendants' knowledge of this exculpatory evidence along with "their appreciation of its import and how it undermined their baseless claim of medical neglect against Sydney's mother." (Doc. 101 at 23). Plaintiff notes Bramblett's May 22, 2019 email to her supervisors Curry and Kramp states: "I read the report referenced in this letter and it clearly says 'presumptive mitochondrial disorder.' I did ask that Dr. Atzemis clarify this though ASAP" (*Id.*) Plaintiff states Dr. Atzemis was neither her medical provider nor a genetic specialist and Dr. Atzemis admitted she deferred to the genetic specialist on this topic. Given Dr. Atzemis' position as a board-certified child abuse pediatrician, it was eminently reasonable for Defendants to consider her opinion in investigating whether Plaintiff must be protected from her parents.

Plaintiff contends Defendants failed to consider Dr. Frye's diagnosis and even tried to hide it. Specifically, Plaintiff alleges there is at least circumstantial evidence of Curry's and Kramp's complicity and liability because they met with Bramblett prior to her testimony. However, the fact that Bramblett sent Dr. Frye's letter to Curry and Kramp bolsters Defendants' claim that they did not violate Plaintiff's constitutional rights. Defendants did not try to hide what Plaintiff describes as "important exculpatory evidence." Bramblett informed Curry and Kramp that she had asked Dr. Atzemis to clarify the matter "ASAP." Dr. Atzemis stated the letter did not change her medical opinion or alleviate her concerns about Plaintiff. Thus, Defendants had knowledge of conflicting medical opinions on whether Plaintiff received unnecessary harmful or potentially harmful medical care and whether she needed protection from pathological healthcare seeking behavior. While Plaintiff complains Bramblett did not address Dr. Frye's letter or findings during the Juvenile Court proceeding, the letter was considered by the Juvenile Court.

Plaintiff further notes Bramblett received the report prepared by DCFS's own clinical psychologist, Dr. Hamon, who evaluated Plaintiff's parents over an extended period and determined there was no finding to support medical abuse. Based on that finding, Plaintiff contends Defendants knew there was no basis to continue their withholding of Plaintiff but they did so anyway. However, Dr. Hamon's evaluation of Plaintiff's parents was completed and submitted to the Juvenile Court in December of 2019, five months after the child protection investigation concluded. Therefore, Dr. Hamon's evaluation is not relevant to the issues in this case.

Plaintiff next cites *Doe v. Heck*, wherein the Seventh Circuit found that caseworkers had violated the plaintiff's right to familial integrity when they interviewed the children without their parents' knowledge or consent, threatened to remove the children, and targeted the plaintiff's parents as child abusers because of their use of corporal punishment. *Heck*, 327 F.3d at 525. Plaintiff fails to mention that the Seventh Circuit determined in *Heck* that defendants were entitled to qualified immunity on each of those familial relations claims because, *inter alia*, defendants would not have been on notice they were violating clearly established law. *Id.* at 525-26.

Similarly, *BeVier v. Hucal*, 806 F.2d 123 (7th Cir. 1986) is also inapposite. In *BeVier*, the parents were arrested for child neglect based on the children's condition, which "weakly supported an inference" of neglect, even though the officer did not question the parents, the medical personnel who treated one of the children, or the babysitter who had been watching them. *Id.* at 126-27. The court determined the officer acted unreasonably in failing to ask questions which would have established the parents were not guilty of child neglect. *Id.* at 127. In such circumstances, "[r]easonable avenues of investigation must be pursued." *Id.* at 128. Because no reasonably well-trained officer would have believed there was probable cause to arrest the parents, the officer was not entitled to immunity. *Id.* at 128-29. In contrast, the DCFS caseworkers in this case conducted an extensive investigation before Plaintiff was taken into protective custody. The investigation revealed ample information which might provide a reasonable DCFS investigator, supervisor, or manger cause to suspect medical neglect. Qualified immunity is appropriate in those circumstances. *See, e.g., Hernandez ex rel. Hernandez v. Foster*, 657

F.3d 463, 476-77 (7th Cir. 2011). Significantly, Plaintiff was ordered removed from her home pursuant to a Juvenile Court order. A seizure is reasonable if it is pursuant to a court order. *See Mabes*, 136 F.4th at 708. Therefore, Plaintiff's seizure was reasonable.

Plaintiff has not demonstrated Defendants violated a clearly established constitutional right. While Plaintiff has cited various cases that discuss in general terms the right to familial relations, Plaintiff has not pointed to any case which addresses with any specificity the clearly established right she believes Curry and Kramp violated. It is important to note that the investigation in this case involved thousands of pages of documents and Plaintiff appears to suggest that the only opinion that matters is Dr. Frye's. However, given the fact that Dr. Frye's opinion did not change Dr. Atzemis's opinion or alleviate her concern about Plaintiff, the Court has no basis to conclude it would have been unreasonable for a DCFS investigator or supervisor to believe that removal was lawful based on the circumstances existing at the time.

The Seventh Circuit recently observed:

> In the end, our analysis roots itself in the recognition that "child welfare caseworkers are often called upon to make difficult decisions without the benefit of extended deliberation." *Doe v. Heck*, 327 F.3d 492, 525 (7th Cir. 2023); *see also Brokaw*, 235 F.3d at 1023 (recognizing that "it is generally the case" that social workers and other state actors who cause a child's removal are entitled to qualified immunity because the alleged constitutional violation will rarely – if ever-- be clearly established"). This case fits that bill to a T, with state officials having to make tough calls under substantial time pressure.

*Mabes*, 136 F.4th at 709-10. The same is true here. Based on the foregoing, the Court finds Glenn Curry and Angela Kramp are entitled to qualified immunity.[3]

## IV.    CONCLUSION

For the reasons stated herein, Defendants Glenn Curry's and Angela Kramp's Motion for Summary Judgment as to Count I of Plaintiff's First Amended Complaint (Doc. 95) is GRANTED. Plaintiff's only remaining claims are state law claims. The normal practice within the Seventh Circuit is that, if all federal claims are dismissed before trial, the district court should relinquish jurisdiction over any supplemental state law claims "in order to minimize federal judicial intrusion into matters of purely state law." *Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015); *see also* 28 U.S.C. Sec 1367(c)(3). The Court finds no basis to depart from that general presumption. Therefore, Count I is Dismissed with Prejudice. The remaining counts are Dismissed without Prejudice. The Clerk is directed to terminate as moot Defendants' Second Motion to Strike Plaintiff's Expert Report (Doc. 73) and Defendants Camelot Care Centers, LLC's Erin Helmholz's, and Kathy Henke's Motion for Summary Judgment (Doc. 79). Upon entry of judgment, the Clerk will terminate this case.

ENTER:  January 5, 2026

COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE

---

[3] The Court previously dismissed Jamie Bramblett as a Defendant and struck the claims asserted against her. Bramblett would be entitled to qualified immunity for the same reasons as her co-Defendants if the claims had not been dismissed or struck.